## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **United States of America** | Case No. 3:25-CR-30 (SVN) |
| v. | |
| **James Schwab,** | |
| Defendant. | May 14, 2025 |

## MOTION TO REVOKE ORDER SETTING CONDITIONS OF RELEASE

The Government respectfully moves this Court, pursuant to 18 U.S.C. § 3145(a), to revoke Magistrate Judge S. Dave Vatti's May 13, 2025 Order releasing defendant James Schwab on a $1.5 million secured bond. The defendant is charged in this case with participating in a kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c), involving the forcible abduction of two victims who were beaten and brutalized. If convicted, the defendant faces a maximum sentence of life imprisonment. He poses a significant danger to the community based on his extended history of sophisticated computer hacking and various internet-based fraud schemes, his association with others with the same history and skill set who are at large and available to him, and his proven track record of directing violence by proxy.  He also poses a significant risk of flight for reasons discussed below, including but not limited to his lengthy prison exposure if convicted and his connections in countries he has traveled and stayed that have no extradition treaty with the United States.

### I.    STATEMENT OF THE CASE

As this Court is aware, on August 25, 2024, two victims in Danbury, Connecticut were hit while in their car, forced out of the car by several masked men armed with baseball bats, beaten and dragged into a waiting van, restrained with duct tape, threatened with death and beaten more, and driven away. They were saved by the fact action of law enforcement, but not before they

suffered significant physical and emotional injury. Six men were arrested on state charges and eventually indicted by a federal grand jury on kidnapping, carjacking, and conspiracy charges. To date, five have pled guilty. The evidence uncovered by the Federal Bureau of Investigation ("FBI") showed that the six men were financed and directed by others, including the defendant who knew the son of the victims and intended to extort millions in cryptocurrency and assets from him.

FBI agents learned a great deal more about the defendant's activities through their investigation. The defendant has been involved in various internet-related fraud schemes since he was a teenager, including computer hacking and SIM swapping. He is entrenched in a world of young men who interact over Discord and Telegram, conceal their true names or other identifying information, and spend their time and talents seeking and finding access to other people's personal assets and data to finance lavish lifestyles, including wildly luxurious accommodations, exceedingly expensive vehicles, pricey jewelry, frequent travel, and lavish outings at nightclubs. The amount of money and assets at issue is truly staggering. In the instant case, for example, the victims were targeted because their son was believed to have stolen hundreds of millions in cryptocurrency from a single victim.

The facts of the case against the defendant reveal much about how he operated. As noted, the target of the criminal scheme here was a young man also involved in internet-based crime, and his alleged success in stealing a substantial amount of cryptocurrency was something that became known in the cryptocurrency world, inhabited by people like the defendant and his associates, before law enforcement and the public were made aware. While in Los Angeles, the defendant reached out over encrypted apps to persons he knew in Miami, a place he had lived and visited several times before. The people he contacted knew of his involvement in internet-based crime and had been recruited by him before to commit violence against others involved with cryptocurrency. The first of the Miami group, Angel Borrero flew from south Florida to New York and then

traveled to Connecticut at the behest and direction of the defendant. The defendant arranged to pay for Borrero's travel using a credit card in the name of someone whose identity and airline miles he had stolen. (One of several who had been victimized by the defendant and his associates in this way.) The defendant used the same credit card to pay for an Airbnb rental property in Roxbury, Connecticut, a house in a secluded area that was large enough to house several people, including the kidnappers and their victims. He rented the property using a fabricated entity. While he used the name "Inc Bulak" to rent the Roxbury property, he often used the name "Videri LLC" or some iteration of that name, with Airbnb. He also used these names when necessary as his purported business entity. In reality, "Videri LLC," "Videri Worldwide," and "Videri Agency LLC," all used by the defendant at one time or another, were fictitious. The defendant also made the fraudulent credit card number available to Borrero's ApplePay account to buy supplies needed for the planned kidnapping.

In addition to the contacts in Miami whom the defendant solicited to commit violence on behalf of him and other criminal associates, he also used the fraudulent card to pay for the travel of four people from St. Louis to Connecticut a few days before the Miami crew arrived. They were supposed to force their way into the victims' home in Danbury and facilitate the theft of cryptocurrency from the son. After days of surveillance and discussion, the St. Louis group left and made way for the Miami arrivals. While his Miami associates were in Connecticut, the defendant connected with them on FaceTime and over Telegram, with messages set for quick delete, using accounts with cryptic identifiers. He encrypted his iCloud account during or after the kidnapping scheme went awry and told an associate that he did so to avoid detection by law enforcement.

Phone evidence shows that the defendant solicited Angel Borrero to commit another crime of violence while he was in New York for the kidnapping. According to messages, a male in New York owed the defendant $1 million, and he wanted Borrero to use force to get it.

3

The circumstances of his involvement in the instant crime are telling as to the risks posed by the defendant. First and foremost, the defendant readily employs violence by proxy, soliciting others with the promise of a substantial payout, to do the hands-on work while insulating himself by using fraudulent cards in the names of others, fictitious entities, and encrypted apps with account identifiers with no obvious connection to him. Second, the defendant has engaged repeatedly in identity theft and fraud over the internet. The person whose identity was stolen and used to obtain the credit card mentioned above also had 100,000 airline miles stolen by the defendant, miles he used to fly from Las Vegas to Miami in July 2024. And the theft of airline miles through hacking was a crime committed several times by the defendant and his associates. A preliminary investigation revealed that the defendant and his compatriots stole over a million American Airlines miles from March through July 2024 by hacking into the accounts of at least four rewards members. Some of the defendant's associates who hacked into these accounts with him are on the defendant's call list at Wyatt. So, he has maintained contact with persons who are not in custody and have access to electronic devices and the internet.[1]

Third, the defendant has access to substantial funds and other assets. In the fall of 2024, he signed a residential lease in Los Angeles that required a monthly rental payment of $55,000 in cash. The defendant paid $330,000 in cash for rent and a security deposit at the beginning of the lease, without any verifiable employment or evidence of any legitimate business. The others who were on the lease with him are fraudsters like him – one is under federal indictment in New Jersey and the other was part of the airlines hacking scheme described above. Conversations recorded since his arrest indicate that the defendant currently has thousands of dollars in jewelry and the

---

[1] Through information provided by Block, Inc. the defendant also had payments of more than $100,000 reported in somebody else's name in 2023, exposing that person to potential tax consequences and concealing the defendant's own connection with questionable financial transactions.

funds to pay for three separate retained lawyers in this case.

Fourth, the defendant readily uses false identifications. From CashApp alone, agents were able to find driver's licenses from four separate states – Illinois, Texas, Rhode Island, and Georgia – with the defendant's photograph and some other name, address and date of birth on each. This evidence suggests that the defendant has ready access to persons who can create new identities.

Fifth, in recent years, the defendant has traveled internationally with some frequency. Directly before his arrest in this case, the defendant spent several weeks in Indonesia, a country with no extradition treaty with the United States. And he was not there strictly as a tourist. His girlfriend's father lives there, providing a strong connection. He has also traveled to Qatar, Saudi Arabia, and the UAE in the recent past, again, all countries with no extradition treaty with the United States. He has internet-based associates who are international; several live outside this country. For someone looking at a multi-year federal prison sentence, exploiting these connections to flee is an attractive option, especially with the sophisticated skills he's developed in the many years he's been engaged in SIM swapping, computer hacking, social engineering, and other internet-based schemes that ensure financial gain.

Sixth, the defendant has shown that he has ready access to electronic devices – himself and by proxy. When he was arrested on his return from Bali, the defendant had a laptop, an Android, and two new iPhones (neither was the phone used during the kidnapping conspiracy). The laptop was password protected twice over, and the iPhones each had 20+ digit passcodes. The Android contained only a VPN and the Signal app, which was set to delete every hour. There were no regular text messages or photos, and no phone number associated with the device. He purchased at least one of the phones internationally. Devices are tools of his trade, and the tools of those who know him, have worked with him, and have substantial means at their disposal. The defendant has been committing crimes for years alongside others, including when he was living with his parents

as a teen. The notion that all this will stop is far-fetched, in the Government's view, given the evidence agents have gathered about the defendant's actions for the last several years.

## II.    PROCEDURAL HISTORY

On January 27, 2025, the defendant was charged by criminal complaint with conspiracy (18 U.S.C. § 371), carjacking (18 U.S.C. § 2119), kidnapping (18 U.S.C. § 1201), and aiding and abetting (18 U.S.C. § 2). Docket Number ("Dkt. No.") 1. Agents arrested him in the Los Angeles airport on his return from Indonesia on January 29, 2025. A federal grand jury returned an indictment, charging the defendant with participating in a kidnapping conspiracy, in violation of 18 U.S.C. § 1201(c), on February 25, 2025. Dkt. No. 8. The maximum sentence for that charge is life imprisonment. At his initial appearance in this District, the Government moved to detain the defendant under 18 U.S.C. §§ 3142(f)(1) and (f)(2), citing risk of flight, risk of witness intimidation and obstruction, and danger to the community as the basis for detention. Dkt. No. 12. Magistrate Judge Vatti entered an order of detention, Dkt. No. 18, pursuant to the Government's motion, and the defendant later filed a motion for release, Dkt. 40, proposing his parents as third-party custodians and co-signors on a secured bond. Magistrate Judge Vatti conducted the hearing over two days, May 7 and May 13, 2025, Dkt. No. 43, ordering the defendant's release on a secured bond. On the Government's motion, the magistrate stayed the order until May 20 to allow the Government to move for a revocation of the release order before this Court.

## III.    APPLICABLE LAW

This Court has jurisdiction under 18 U.S.C. § 3145(b) and must review the issue of bail *de novo. See United States v. Leon,* 766 F.2d 77, 80 (2d Cir. 1985) (when a party files an appeal from a magistrate judge's decision detention decision, the district judge "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion"); *United States v. Minnici,*

128 Fed. Appx. 827, 828 n.1 (2d Cir. Apr. 26, 2005) ("A district court reviews *de novo* a magistrate judge's order of pretrial release or detention." (citing *Leon*, 766 F.2d at 80)).

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, sets the statutory standards for determining whether a criminal defendant should be detained or released pending trial. Under the Bail Reform Act, the Court "shall order the pretrial release of [a defendant] on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court . . . , unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Detention is warranted if, after a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); *see United States v. Baig*, 536 F. App'x 91, 92 (2d Cir. 2013) ("[A] finding of either danger to the community or risk of flight will be sufficient to detain the defendant pending trial."); *United States v. Epstein*, 425 F. Supp. 3d 306, 320 (S.D.N.Y. 2019) (detention founded on danger to the community must be supported by clear and convincing evidence); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (detention founded on risk of flight must be supported by a preponderance of the evidence).

The Bail Reform Act identifies four factors for the Court to consider in "determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community": (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *Baig*, 536 F. App'x at 92 (quoting the four factors).

Moreover, the Court is not limited to considering only the charges pending against a defendant when "assessing the degree of danger posed by [the] defendant's release." *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015) (alteration added); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (reversing release and ordering detention while rejecting the "requirement that the violent conduct" serving as a basis for detention "be connected to the activity charged in the indictment"). The Government has the burden to prove "by clear and convincing evidence that the defendant presents a danger to the community," and "by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

## IV. DISCUSSION

Here, the defendant poses a risk of flight and a danger to the community, and the Government submits that the release order fails to mitigate that danger, reasonably assure the defendant's appearance at future proceedings, and prevent his likely flight if he is released to the community.

### A. The Four Factors

#### 1. Nature and circumstances of the offense

Orchestrating a violent kidnapping is one of the most serious offenses in federal criminal law, which is the reason for the maximum sentence of life imprisonment. In this case, two innocent people were forcibly grabbed, brutally beaten, thrown into the back of a van, duct-taped over head, face, arms and legs, and repeatedly threatened with death. That fact that the defendant was a primary orchestrator of the crime, provided funds, and solicited others to do the dirty work makes him more culpable than the ones who traveled to do the job at his request, in the Government's view. The defendant's actions were callous, cruel, and motivated by greed and resentment. And the result is permanent trauma and loss on the part of the victims. The defendant set these events into motion, and if the plot has gone as planned, was one of those who stood to profit the most. In

considering the danger posed by the defendant, the nature of the crime provides important insights. The defendant was able to use hacking and other skills and connections to pay the expenses of his associates at no cost to himself. And, from the comfort of a residence far from Connecticut, was able to coordinate a violent plan and put it into action here. He need not be physically present to be a danger. And he has, for years, used the anonymity of the internet and false or fictitious identities to steal from and defraud others. That has been his pattern and practice since he was a teenager living with his parents, and accomplishing it without their knowledge, apparently. He has made connections with associates who have the same skills and inclinations that he has and have participated with him in criminal schemes before. He can be as dangerous by proxy through them as he is directly, particularly when he needs money to finance his defense in this case.

### 2. Weight of the evidence

The evidence against the defendant is substantial. Text messages and other phone activity show the defendant's direct involvement in procuring the van and the rental property where the kidnappers would stay. They also show communication between him and at least two of the kidnappers while they were in Connecticut, conducting surveillance and determining when and where to grab the victims. There is additional evidence linking the defendant to the victims' son, indicating that the defendant had plans to target him before the kidnapping, using some of the same people. Evidence from Airbnb, the airlines, and other sources show the defendant's paying for travel and lodging, both for the crew from St. Louis and for the group from Miami. The evidence also will show that the defendant had a history with both Angel Borrero and Reynaldo Diaz, the type of history that led him to believe correctly that they would travel from Florida to Connecticut to commit crimes at his bidding. In short, the Government's case against the defendant is quite strong.

### 3. The history and characteristics of the defendant

The defendant has no ties to Connecticut. While his parents live in Georgia, and he has stayed there in the past, the reality is that the defendant has lived a transient and lavish lifestyle. The Government has evidence of him staying in Miami, Las Vegas, Texas, Los Angeles, and other places over the last few years, typically in Airbnb's rented in fictitious names, and often with people who were committing the same or similar crimes as he. He was able to pay $330,000 in cash in the fall of 2024 for a residence in Los Angeles but spent weeks in Bali prior to his arrest at the end of January 2025. He has no employment history and no legitimate business, but his lifestyle appears to be extravagant. He has sophisticated computer skills and from all appearances has used his skills primarily if not exclusively for fraudulent gain. He has taken measures repeatedly to conceal his digital data and mask his online presence. And he has used forged and false identification repeatedly. Significantly, for purposes of this motion, the defendant has associates who are part of this world and unknown to the defendant's family who have participated in the same or similar activity, at times with him.

While the defendant has been committing crimes for years, he has not been caught before now. So, his introduction to the criminal justice system is in federal court on a charge that carries a life sentence. For someone with his skills, associations, and history, the risk of flight and of continued danger to the community is high.

### 4. Danger to the community

For all the reasons discussed above, the defendant continues to pose a danger to the community. The crimes he commits can be done anywhere and either directly by him or by others at his solicitation. While the magistrate tried to mitigate the risk, the Government respectfully submits that the combination of the defendant's sophisticated computer skills, his association with others similarly skilled (including those with international connections), his years-long history of

criminal conduct, his ready use of deception and false identification, and his access to and continued need for substantial assets will lead him to commit the conduct he has been committing for years.

**B.  The defendant is a serious flight risk.**

Aside from presenting a danger to the community, the defendant has enormous incentives to flee. First, he faces a maximum lifetime of imprisonment and understands that he is likely to receive a very substantial sentence. Second, he likely knows or will soon learn of the strength of the Government's case against him. The current case is strong; the evidence is only likely to grow stronger as the investigation progresses. *See United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022) ("Where . . . the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight."); *United States v. Berkun*, 392 F. App'x 901, 903 (2d Cir. 2010) ("Because the evidence of guilt is strong, it provides [the defendant] with an incentive to flee."); *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (concluding that "a district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee"); *United States v. Bruno*, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long . . . a defendant has stronger motives to flee.") (quoting *United States v. Iverson*, 14–CR–197, 2014 WL 5819815, at *4 (W.D.N.Y. Nov. 10, 2014)).

**C.  The release order fails to include conditions that will reasonably assure the defendant's appearance in court or the safety of community.**

Lastly, the magistrate judge's release order is insufficient to assure the defendant's appearance in court and the community's safety. Under the release order, the defendant will stay with his parents with location monitoring. His $1.5 million bond is secured by two houses his parents own. On the surface, these conditions may seem significant. But the defendant's situation is not

like most other defendants. First, in the world of cyberhacking and cryptocurrency theft, $1.5 million is not sizable. Indeed, in August 2024, the defendant directed Borrero to collect a million dollars from one young male in New York whom he said owed him. The defendant and those he associated with regularly were able to rent literal mansions costing tens of thousands each month in rent. It would take little time for the defendant to cover any loss if the bond were forfeited. Second, his parents do not know his associates and connections and do not possess the same computer skills as the defendant. While they may intend to prevent the defendant from committing crimes or fleeing, ultimately, his actions are his choice. Cutting off a location monitoring device and using his connections and access to funds to flee would be a fairly simple matter for him. *See United States v. Benitez-Elvira*, 2014 WL 6896142, at *3 (M.D.N.C. Dec. 5, 2014) (concluding home confinement and electronic monitoring "would not reasonably address the flight risk present here because the defendant could depart his approved residence for parts unknown before probation officials reasonably could respond to any electronic or human report of his unauthorized absence."). And he has strong incentive to do so, given what he faces in this case. Third, the third-party custodians are family members. Their first allegiance is to their son. They either have been ignorant of what he has been doing for years, they have chosen to turn a blind eye, or they knew what he was doing and condoned it. In any scenario, they likely do not want to see him sentenced to federal prison. And given the strength of the Government's case, that is what is likely to happen if he remains with them.

## V.    CONCLUSION

For all of these reasons, the government respectfully requests that Magistrate Judge Vatti's release order be revoked, and the defendant be detained by the United States Marshals Service pending the resolution of his current criminal charges.

<div style="margin-left: 40%;">

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

//s//

KAREN L. PECK
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT 14959
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
Tel: (203) 696-3000
Karen.peck @usdoj.gov

</div>

## **CERTIFICATION**

I hereby certify that on May 14, 2025, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*//s//*
KAREN L. PECK
ASSISTANT U.S. ATTORNEY