UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v. Case No. 25-cr-30 (SVN)

JAMES SCHWAB, *et al.*

**UNITED STATES' OPPOSITION TO**
**"MOTION TO MODIFY CONDITIONS OF RELEASE" (Doc. No. 270)**

The United States respectfully opposes the defendant's "Motion to Modify Conditions of Release." Doc. No. 270.[1]

## I. RELEVANT HISTORY

On January 29, 2025, the defendant, James Schwab, was arrested pursuant to an arrest warrant and criminal complaint for his participation in a conspiracy to steal approximately $50 million in stolen Bitcoin, part of a $240 million cryptocurrency theft, said conspiracy involving the kidnapping of, and violence to, the parents of his intended target. The conduct was serious, sophisticated, and violent. And this defendant helped to orchestrate and lead it, from thousands of miles away, after previously engaging another person to try and kill the target after an altercation in a nightclub. *See* Doc. No. 70 at 4; Doc. No. 78 at 6. The violence, along with the defendant's resources and significant incentive to flee, is why this Court and the District Court both found that the defendant "poses a risk of flight by a preponderance of the evidence and…a danger to the safety of other persons or the community by clear and convincing evidence." *See* Doc. No. 78 at 4 (District Court's Order on Motion to Revoke Conditions of Release).

[1] As discussed below, the United States defers to the Court on whether to release from the bond one of the defendant's parents' two homes in Georgia.

Nonetheless, this Court ultimately set very strict conditions that it found were necessary to address those risks, which Judge Nagala supplemented when considering the issue of release *de novo*. *See id.* at 13 (adopting additional conditions upon review). Central to the decision to release the defendant pending trial was the requirement that the defendant's parents would be responsible for closely monitoring his compliance—even traveling with him anywhere outside the home—and the significant consequences that the parents would face—including the loss of both of their homes—for *any* of violation of *any* condition. *See id.* at 13.

Since his arrest and release, however, the defendant has filed many motions to modify the carefully considered conditions. A brief history of the conditions and related litigation in this case follows to provide context for the defendant's most-recent motion.

**A. Original Conditions**

The United States sought detention in this case at its outset, and the defendant sought release. When first considered in Connecticut in May of 2025, this Court entered an order setting conditions and releasing the defendant, and explained it in a docket entry. Specifically, this Court explained its reasoning, emphasizing the role of the defendant's parents, among other things:

- The Court concludes that defendant poses a serious risk of flight and a danger to the community. However, the Court can impose conditions that sufficiently mitigate the risk of flight and any danger to the community.

- Defendant proposes to live with his parents in Georgia, who own two homes in that state with significant equity. Defendant's mother is retired, and his father, who has now decided to postpone retirement in part due to his son's situation, works remotely from home. Both will be present in the home throughout the day and will be available to provide close supervision of the defendant.

- Here, the Court canvassed both parents and finds them to be strong, reliable, and suitable custodians. They understand and accept the financial risk they have agreed to undertake. . . It is clear they care deeply for their son and understand the gravity of the charge he faces, and the importance of his compliance with his release conditions.

- Not only do they [the parents] have the requisite moral suasion as sureties and custodians to ensure compliance, but the conditions imposed financially incentivize them to do so. They intend to co-sign a $1,500,000 appearance bond secured by their two properties in Georgia, the total equity being equivalent to the amount of the bond.

- While they may have been unaware what the defendant was doing over the past two years, their [the parents'] eyes are clearly open now given what they heard in multiple hearings from the government and they well aware that their financial future in large part depends on ensuring that their son not only appears in court when required and that he does not commit any federal, state or local crime while on release.

- If defendant fails in either respect, the bond shall be forfeited, and his parents will lose their homes. The defendant's parents understand those potential consequences and the defendant, too, is aware of the financial peril to which his parents are subject.

*See* Doc. No. 49

**B. Motion to the District Court to Revoke the Conditions**

The United States appealed this Court's order setting conditions to the District Court and, ultimately, Judge Nagala denied the Government's motion. In doing so, however, Judge Nagala said the issue of detention, given the facts of this case[2] and the defendant's situation, "poses a close question," *see* Doc. No. 78 at 9, and it was the very strict conditions that this Court imposed that would ensure the safety of the community against further acts of violence and the defendant's future appearance in court.

Judge Nagala highlighted the following to address the safety of the community:

- Schwab would not have contact with anyone other than his family members, would not be able to leave his parents' home in rural Georgia, would not have

[2] In that litigation, the District Court considered the then-newly discovered evidence with the previously proffered information in concluding that it was a close question, including the allegations that "Schwab hired the kidnappers…sought to hire a separate group of individuals to kidnap the victims…sought to hire two separate individuals to harm and/or murder the victims' son, and that while in custody, he identified an incarcerated potential Government witness to a third party, putting the purported witness at risk." *See* Doc. 78 at 9.

access to any Internet-capable device, and would be subject to location monitoring with exclusion zones around airports.

- Further, one of his parents, as his proposed custodians, would be required to aways be in the home to supervise him, and both parents would need to password- and biometrically-protect any Apple iPhones/iPads or other cellular devices and password protect their personal laptops, with the passwords not to be shared with Schwab.

- [T]he Court emphasizes that it is placing significant trust in Schwab's parents, as his proposed custodians, to monitor his compliance with the conditions imposed by the Court.

*Id.* Judge Nagala then addressed, in part, the risk of flight by highlighting the potential consequences his parents face of losing both their homes should the defendant fail to appear:

- But again, the stringent restrictions that the bond conditions place on Schwab's ability to communicate with individuals beyond his family or access the Internet in any way sufficiently mitigate his flight risk, to the level of reasonable assurance that he will appear for court proceedings. Without Internet access, the ability to contact individuals beyond his family, or the ability to leave his parents' home, Schwab is significantly less likely to be able to access his cryptocurrency assets or use false identification documents.

- And the consequences for his family were he to violate his conditions of release are severe: his parents would lose both of their homes, which have been pledged as collateral for his $1,500,000 bond, and an additional $25,000 pledged in cash.

*Id.* at 11. And, Judge Nagala was sufficiently concerned with the defendant and the charged conduct that she went further than this Court and imposed additional requirements. Specifically:

> [t]he Court also believes it is appropriate to take the further step of allowing the bond and collateral to be forfeited if Schwab fails to appear in Court as required or violates *any* condition of release, which Schwab agreed to on the record at the May 28, 2025, hearing. This will provide the Court with added assurance that Schwab's parents will thoroughly supervise his compliance with the conditions, lest they risk losing their homes and significant cash posted as bond. To be clear, this condition goes beyond Judge Vatti's condition that the bond and collateral would be forfeited only if Schwab fails to appear or commits a federal, state, or local crime while on release.

*Id.* at 13. Finally, Judge Nagala added a requirement that the defendant "appear in person in Connecticut" if any "additional hearings [are] required in this matter prior to trial," and that at

least one of his parents "will be required to travel with him for any Court appearance, to continually monitor compliance with his conditions of release." *Id.* at 14.

When the defendant and his parents appeared a short time later to complete the bond paperwork, Judge Nagala allowed the defendant to obtain a flip phone that is not connected to the internet for "the purposes of communicating with his defense team via voice call and text massages…[and] for purposes of communication with the U.S. Probation Office." *See* Doc. No. 89. That condition was also very strict and meant that the defendant could not contact anyone else using that phone, even his girlfriend, whom he could only talk to on the phone if his parents made the call and remained present for the conversation. *See* Doc. No. 91 at ¶ 6; *see also* Doc. No. 127 ("he may have telephonic contact with S.W. on speakerphone in the presence of one of the third-party custodians").

**C. August 2025 Modification Motion**

In August of 2025, just over a month after finalizing the bond conditions, the defendant sought to modify the conditions "related to his location monitoring program, the limits placed on visitors to the home, the restrictions on Mr. Schwab's ability to be at home without a parent present, and the limitations on his ability to use the outdoor spaces surrounding his residence." *See Doc* 114 at 1. Ultimately, this Court insisted that the defendant's parents remain third-party custodians—not his older siblings, as proposed—but amended the conditions to permit: (1) the defendant to use the yard/outdoor spaces of his residence (but without access to any boat), (2) the defendant to attend medical/dental appointments, religious services, and other advance appointments with notice to and permission of the probation office, and accompanied by at least one parent, (3) the defendant to spend one hour outside of the home from 530pm to 630pm on Monday through Saturday "provided he is accompanied by at least one parent," and (4) the

defendant's parents to have up to 4 visitors from their own friend group at their home, "provided the visitors' electronic devices remain in a locked car for the duration of the visit." *See* Doc. No. 121.

**D. October 2025 Modification Motion**

Two months after that, in October 2025, the defendant again sought to modify his bond conditions, this time to: "(1) modify the limits placed on visitors to the home (specifically, the limits placed on his girlfriend, S.W.); (2) modify his conditions related to his location monitoring program; (3) permit the United States Probation Office to approve overnights at the Atlanta area residence where appropriate; and (4) permit a family member to serve as a temporary third-party custodian so that Mr. Schwab may be at home without a parent present." Doc. No. 129 at 1.

The Court partially granted the motion and modified the then-imposed conditions to (1) enable the defendant's girlfriend to visit his home so long as she doesn't bring any electronic devices, (2) change home incarceration to home detention, "meaning that the defendant is restricted to his residence, except for employment, education, religious services, medical, substance abuse, or mental health treatment, attorney visits, court appearances, court-order obligations or other activities approved in advance by the Probation Office" *so long as* he is "transported and accompanied to such activities by one of his parents," (3) stay overnight at his parents' Atlanta residence "provided he is accompanied by a parent" and gets the Probation Office's approval upon giving at least 48 hours' notice and all documentation "as to the reasons for the overnight stay," and (4) enable the defendant's oldest bother to serve as a "temporary custodian so that the defendant's parents may leave the residence together provided there is prior notice to and approval by the Probation Office." *See* Doc. No. 137. In doing, this Court also made clear that the "defendant is permitted to seek employment, but at this time, defendant shall

not seek any employment that requires use of devices with internet access as an essential function of the job." *Id.*

### E. February 2026 Modification Motion

Then, in February 2026, the defendant sought again to chip away at the carefully considered conditions that this Court and Judge Nagala imposed, this time to: "(1) modify his conditions related to his location monitoring program to convert it from home detention to curfew; (2) modify the condition requiring a third-party custodian to be with him at all times; (3) modify the condition so that he can spend multiple days at the home in Atlanta; (4) modify the conditions limiting his use of internet capable electronic devices; (5) modify the condition restricting his travel to Georgia and Connecticut to include New York, where co-counsel is located; (6) modify the device restrictions for visitors." *See* Doc. 169 at 1. After the United States opposed the changes, the defendant filed a supplemental motion to remove two individuals from the no-contact list. *See* Doc. No. 174.

This Court granted in part the motion and modified the conditions to (1) enable visitors to the defendant's home to enter with electronic devices so long as they are password protected and the defendant has no access to them, (2) enable the defendant's travel to New York and Connecticut for attorney visits "provided is accompanied by at least one of his parents," (3) keep the defendant on home detention—rather than curfew—but enable him to leave the home for reasons previously permitted without a third-party custodian, except for stays in Atlanta and travel out of state, and (4) enable the defendant to use an Android phone approved by Probation and subject to software-based monitoring, but that cannot be used for specific messaging, social media, VPN, and cryptocurrency purposes, among others. *See* Doc. No. 177. Shortly after, the Court also removed the requested two individuals from the no-contact list. *See* Doc. No. 179.

### F. June 2026 Modification Motion

In June 2026, the defendant filed yet another motion to "(1) modify his conditions related to his location monitoring program to convert it from home detention to stand alone monitoring now that he has secured potential employment and an opportunity to attend college classes; (2) modify the conditions limiting his use of internet capable electronic devices to include a laptop in addition to the cell phone that was previously approved." *See* Doc. No. 220.

The United States did not object to the defendant leaving his residence to work scheduled hours at a barbershop, but noted that the defendant had not provided any information about school enrollment or classes that would justify further absences from his home. *See* Doc. No. 228. The United States also opposed the proposed laptop condition "without a specified reason for needing it," and the defendant did not offer any employment or school-related justification with his motion. *Id.*

This Court ultimately entered an order modifying the conditions to "permit standalone location monitoring in place of home detention" in order "to facilitate his employment and academic opportunities," and allowing "the defendant the use of a laptop computer provided it is equipped with software that permits monitoring of the laptop's use by USPO." *See* Doc. No. 231.

## II. THE PENDING MOTION

As indicated above, this Court has consistently—from the very beginning—insisted on need-based travel restrictions and significant oversight from the defendant's parents (along with related consequences to them) to ensure the safety of the community and the defendant's appearance in court, despite motions that would walk those carefully considered conditions back.

Now, however, the defendant asks again to modify his conditions related to travel and supervision by his parents. That is, in August of 2026, the defendant filed another motion to

modify his conditions to "(1) permit him to stay overnight in Atlanta without the presence of a custodian; (2) […] permit him to travel to New York to meet with counsel without a custodian; and (3) modify the properties held by the bond to permit the bond to be secured by a single home (the value of which exceeds the $1.5 million bond set by the Court), instead of by both the custodians' homes." Doc. No. 270.

The United States defers to the Court on whether to release the Atlanta home from the bond,[3] but opposes the remaining modifications.

Notably, the defendant suggests to this Court that he needs to travel to, and stay in, Atlanta "without the presence of a custodian" for "obligations" that might "keep him late in the evening," but never specifies what those obligations are. Such significant changes to the supervision and travel conditions imposed by this Court and Judge Nagala are not warranted at all, but should require, at a minimum, a showing of the basis and need for unsupervised travel. In an email, defendant's counsel said that the defendant "needs to be able to stay overnight" in Atlanta "to be able to work and attend school," but did not provide to the U.S. Attorney's Office or this Court any details about the purported work schedule, school enrollment, or class schedule that demonstrate the necessity of unsupervised travel and staying overnight two hours away from

[3] Although the United States defers to the Court on this particular property-based condition, it notes that this Court and the District Court has repeatedly emphasized that the prospect of the defendant's parents losing *both* of their homes would motivate the defendant to comply with conditions, thereby addressing the risks posed to the community and of flight. *See* Doc. No. 49 ("If defendant fails in either respect, the bond shall be forfeited, and his parents will l*ose their homes*. The defendant's parents understand those potential consequences and the defendant, too, is aware of the financial peril to which his parents are subject." (emphasis added)); Doc. No. 78 at 11 ("And the consequences for his family were he to violate his conditions of release are severe: his parents would *lose both of their homes*…" (emphasis added)); *id.* at 13 ("This will provide the Court with added assurance that Schwab's parents will thoroughly supervise his compliance with the conditions, le*st they risk losing their homes* and significant cash posted as bond" (emphasis added)). The prospect of losing not one, but two, homes has a deterrent effect in and of itself.

his approved residence. Indeed, the only information the United States has been given is that the defendant was supposed to work at a barbershop close to home (and *not* the home in Atlanta) and had not registered for classes; thus there was no class schedule and no information about where the classes would take place or whether they were remote. Moreover, if his parents sell the Atlanta house and he is permitted to travel without parent-custodian supervision, as he requests, the defendant will effectively stay, unsupervised, at unspecified locations, potentially with access to unauthorized devices, with others who have not been approved for full-time supervision. Again, without a showing of necessity, such a modification in this case is unwarranted.[4]

Finally, this Court and the District Court carefully considered the conditions necessary to ensure the safety of the community and the defendant's future appearance, and determined that strict conditions with severe potential consequences to his parents were necessary, thereby "placing significant trust in Schwab's parents, as his proposed custodians, to monitor his compliance with the conditions imposed by the Court." Doc. No. 78 at 9. Judge Nagala even required his parents to travel with him for all court appearances "to continually monitor compliance with his conditions of release." *See id.* at 14. Although there may be some expense and inconvenience to his parents to do so, there is no meaningful reason to remove a significant check on the defendant's compliance—parental supervision—especially for travel hours from home to Atlanta, New York, or elsewhere.

[4] The defendant suggests that location and device monitoring will address any concerns related to unsupervised travel and overnight stays at places other than his authorized residence. *See* Doc. No. 270 at ¶ 3. Knowing where the defendant is via location monitoring is very different than knowing who he is with, what he is doing, and, among other things, whether he is using unknown devices that are not subject to monitoring, all of which are relevant in this case where encrypted communication platforms and cryptocurrency—some unrecovered—feature prominently.

The defendant has sought and received continuances of the jury selection date, presumably knowing that such continuances will increase his time on pretrial supervision. That is the choice he and his counsel have made. The tradeoff for having additional time to consider his options and prepare for a plea or trial is continuing to be supervised closely, given the nature of the crimes charged.

**III. CONCLUSION**

This Court should deny the defendant's motion to modify travel and supervision related conditions, and the United States defers to the Court with respect to releasing a property from the bond.

Respectfully submitted,
DAVID X. SULLIVAN
UNITED STATES ATTORNEY

_*/s/Daniel George*________________________
DANIEL GEORGE
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. phv207404
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: (203) 821-3700
Daniel.George@usdoj.gov